426 So.2d 196 (1982)
Willie ANDREWS, Plaintiff-Appellant,
v.
PINE HILL WOOD COMPANY, et al., Defendant-Appellee.
No. 14996.
Court of Appeal of Louisiana, Second Circuit.
September 20, 1982.
On Rehearing January 24, 1983.
Writ Denied March 18, 1983.
*198 Simmons & Nelson by Otha Curtis Nelson, Sr., Baton Rouge, for plaintiff-appellant.
Dawkins, Coyle & Carter by Michael L. Coyle, Ruston, for defendant-appellee.
Before PRICE, SEXTON and NORRIS, JJ.
SEXTON, Judge.
This is an appeal from a worker's compensation judgment. Claimant-appellant, Willie Andrews, is a 57 year old man who has worked for his present employerPine Hill Wood Company (hereinafter referred to as Pine Hill)for over a decade.
On July 6, 1979, claimant Andrews filed a petition with the District Court seeking disability benefits, statutory penalties and attorney's fees from Pine Hill and its co-defendant, Georgia Casualty and Surety Company (hereinafter referred to as Georgia Casualty), Pine Hill's compensation insurer, as a result of an accident on August 21, 1978. The defendant denied that claimant had been disabled, in its answer, and further alleged that it had compensated claimant for any absence from work that had been caused by his work-related injuries.
The parties' claims and defenses were afterwards litigated in piecemeal fashion. Trial was commenced on January 11, 1980, and subsequent to that day was not resumed until June 20, 1980. The trial was completed on that date and the court took the matter under advisement. Prior to rendering an opinion in the case in a Memorandum Order dated April 30, 1981, the trial court ordered that a new trial be held to adduce evidence on the sole issue of the plaintiff's entitlement to compensation for facial disfigurement. The trial court expressly mandated therein that judgment on all issues be held in abeyance pending the new trial on facial disfigurement. The new trial was conducted on September 8, 1981. At this time, the plaintiff moved to reopen his case in chief in order to present the testimony of one Dr. John E. Hull, and this motion was denied by the court. The trial court finally filed a judgment on December 8, 1981, which denied plaintiff's claims for disability payments, statutory penalties and attorney's fees, but granted plaintiff an award of $65.00 per week for 100 weeks for facial disfigurement, subject to a credit of $1,170.00 for compensation payments previously made.
Subsequent to the rendering of this judgment, the court on January 4, 1982, heard additional motions of both parties for a new trial. The court granted a second new trial which was, like the first, restricted to a single issuethe plaintiff's right to be compensated for past medical expenses. While the trial court denied plaintiff's motion to hold a new trial on the issue of Mr. Andrews' disability and restricted the new trial to the issue of past medical expenses, plaintiff's counsel nevertheless examined Dr. Hull at the January 4th hearing and made a proffer of Dr. Hull's oral testimony on the subject of disability. Dr. Hull was also cross-examined by defense counsel at the January 4th hearing.
*199 This protracted litigation was brought to a close in a judgment on the new trial filed March 5, 1982. The trial court rendered a judgment affirming the prior judgment in all respects, except that the new judgment awarded the plaintiff $730.00 for past medical expenses. The end result of this fragmented litigation is that plaintiff has been denied disability benefits and statutory penalties and attorney's fees, but has been awarded $65.00 a week for 100 weeks for permanent facial disfigurement and $730.00 for past medical expenses. Finding merit in plaintiff's claim of permanent partial disability, we reverse.
There are essentially three issues which are presented for our consideration. The first issue involves the question of whether Willie Andrews has a valid claim to partial permanent compensation benefits as he asserts in brief to us. The second focal question is whether the trial court properly compensated plaintiff for facial disfigurement. The third issue is whether plaintiff is entitled to statutory penalties and attorney's fees for defendant's alleged recalcitrance in paying benefits and medical expenses.

I. PLAINTIFF'S CLAIM FOR DISABILITY BENEFITS
We are compelled to reverse the trial court's finding that claimant is not entitled to disability benefits. This determination is made in full view of the well established principle that factual findings of the trial court in compensation cases are to be deferentially treated.
The parties have stipulated that Mr. Andrews' injuries, if any, have been incurred within the scope and course of his employment and that these injuries are therefore covered by the workers' compensation insurance policy issue by Georgia Casualty to Pine Hill.
The accident here occurred on August 21, 1978. On that date, Mr. Andrews sawed down one tree in which, unknown to him, a second tree was lodged, the second tree fell, striking Mr. Andrews across the forehead, upper back and shoulders. The tree which hit Mr. Andrews was big enough to be considered a logbeing approximately 18 inches in diameter at its base. Mr. Andrews was knocked off his feet by the impact of the tree and was seen by one of his employees, Joe Bass, Jr., attempting to get to his feet. Mr. Andrews was unable, unassisted, to get back to his feet and Joe Bass "helped got him up and sat him on the log." Mr. Andrews was bleeding profusely from the forehead. Joe Bass asked Mr. Andrews if he could walk to his truck, and Mr. Andrews responded affirmatively. However when he attempted to walk to his truck, Mr. Andrews "act like he was weak" and Mr. Bass, with the assistance of Mr. Andrews' son Franka co-employeecarried Mr. Andrews to his truck. Mr. Andrews was in the hospital for five days, after which time he was discharged not on doctor's orders, but because he was impatient to tend to his affairs.
While the events surrounding the injury clearly attest to the severity of the original impact, we are, in analyzing the disability issue, particularly impressed by Mr. Andrews' willingness to work and the dramatic effect which the trauma had upon Mr. Andrews' exemplary work habits. Mr. Andrews was not content to merely supervise his employees. He operated a chain saw himself and typically worked seven days a week from sunup to sundown. The testimony establishes not only that Mr. Andrews worked long hours, but that he labored with high intensity during those hours. Spencer Allen, the proprietor of Pine Hill, testified that Mr. Andrews was "one of the best [chain saw operators] I ever seen." As Mr. Allen testified, claimant has "worked hard," and the propensity for hard work which was attested to by both the adverse party, Spencer Allen, and by Mr. Andrews' employees has perhaps been best summarized by Mr. Andrews himself: "I wasn't faking at all. I'd be more than glad now if I was back able to work like I was in 1978 before that tree hit me. I'm not a begging man. See, I like to work for what I get."
While the record is unequivocal with respect to Mr. Andrews' work habits, it is equally clear with respect to the vivid contrast *200 between Mr. Andrews' pre-injury and post-injury mobility and ability to work. When Mr. Andrews did return he was no longer able, because of substantial pain, to operate a chain saw all day long as he had previously. Instead, he would make periodic attempts to operate his chain saw and would have to quit after twenty or thirty minutes because of the pain he encountered in his chest and upper back. As his employees testified, he would return to his pickup after unsuccessful attempts to operate his saw, and either go home in his pickup or sleep in his truck. The pre-injury/post-injury dichotomy between Mr. Andrews' ability to produce is further emphasized by the fact that prior to the injury, his crew of six sawyers kept two trucks busy hauling wood while now a crew of five requires only one truck.
Mr. Andrews' work history and the stark contrast in his capabilities before and after his injury constitute the essence of our determination that he has been disabled by a work-related injury. However the law requires, as a general proposition, that compensation claims be supported by objective and medically verifiable physical symptoms. See LSA-R.S. 23:1317. Mr. Andrews' claim is corroborated by the medical data; although the medical testimony in this case has often been ambiguous with respect to the extent, cause or duration of claimant's injuries, there has been little equivocation as to the existence of plaintiff's injuries.
Dr. Wadlington testified that he first examined claimant on the day of the accident and that Mr. Andrews, when admitted, "had suffered a rather extensive laceration and complained of anterior chest cage pain and pain in the left ankle. Dr. Wadlington's final diagnosis was that plaintiff had received, in addition to head lacerations, contusions of the anterior chest cage and left ankle and a fracture of the sternum that was revealed by tomogram x-ray. Although Dr. Wadlington did not feel that claimant was permanently injured, he nevertheless testified that claimant "should eventually be able to return to work" which testimony is important insofar as it very clearly implies that it was the doctor's belief that Mr. Andrews was not, at the time of the injury, able to work.
Dr. Booth testified that he treated and examined Willie Andrews many times in the 16 month period following the injury. In September of 1979 he treated Willie Andrews for his complaints of "cervical spine pain and thoracic cage pain." With reference to the sternum injury caused by the accident, Dr. Booth testified that "The anterior chest pains have continued and the patient has not been able to do his regular work and he thinks he should have long since gotten over the pain that he has in chest and he seems to be quite disappointed that he's not able to do a full day's work." Dr. Booth testified, furthermore, that "we explained to the patient that he had attained maximum recovery from the traumatic injury ... and he is just going to have to learn to live with it and do a full days' (sic) work as he used to." Implicit in Dr. Booth's testimony is the doctor's recognition of the existence of a "traumatic injury."
The most in depth medical testimony was that of Dr. John Hull, proffered by plaintiff, and excluded by the trial court in its denial of plaintiff's respective motions to reopen and commence a new trial. Dr. Hull, a qualified rheumatologist specializing in inflammations of the musculo-skeletal system, corroborated the testimony of the other doctors as to the symptomatic and medically verifiable nature of Mr. Andrews' injury. Dr. Hull, whose testimony was based upon five visits by claimant and extensive x-ray examination, testified that claimant had an "extra bone deposited at the site of the [sternum] fracture and had persistent inflammatory process going on, which I felt was probably related to the injury, probably triggered by the injury" and an "unusual condition called sternocostoclabicular hyperostosis ...." Dr. Hull was asked, on cross-examination, whether he would disagree with a diagnosis that plaintiff has not suffered any permanent injuries as a result of the 1978 accident. Stated Dr. Hull:

*201 "Yes, I would. The condition in his sternum is unusual. It is not a condition that occurs following an accident then disappears completely. Not necessarily does that. The nature of this disorder is that it is an inflammatory continuing process that has ups and downs much the same way that other types of arthritis have ups and downs. Itit takes time for the appearance on x-ray. Deposition of new bone and I would not be surprised that a diagnosis of this condition was not made at that time and in addition to that, it's a very unusual condition and it's more apt to be in the area of rheumatology than it would be in orthopedics."
Dr. Hull further amplified the nature of Mr. Andrews' condition by stating that "[T]here is disability in that there has been a bone disease set up that is a source of pain...." Moreover,
"The disability in this case is secondary to a continuing inflammatory process that was found to be active two years after the injury or whatever the period of time was when I first saw him. There was evidence at that time that there was a continuing inflammatory process in the sternum"
As we have previously chronicled, Dr. Hull's testimony was not offered until quite late in the proceedings and was heard as a proffer. We have determined that this testimony should be considered. We are compelled by several factors to assess this testimony on proffer. The most significant of these reasons is the cardinarl presupposition, in workers' compensation cases, that "The court shall not be bound by technical rules of evidence or procedure other than as herein provided...." LSA-R.S. 23:1317. Section 23:1317 reflects the legislature's intent, in compensation cases, to materially relax evidentiary and procedural rules and subordinate procedural considerations to the discovery of the truth and the protection of substantive rights. Rhodes v. Keasby-Mattison Co., 110 So.2d 747 (Orl.La.App. 1959); McQueen v. Tremont Lumber Co., 151 So. 683 (La.App. 2d Cir.1934); Vignaul v. Howze, 150 So. 88 (La.App. 1st Cir.1933). See also, McDermott v. Cronvich, 379 So.2d 867 (La.App. 4th Cir.1980); Brewton v. L.L. Brewton Lumber Co., 349 So.2d 1364 (La. App. 2d Cir.1977); Geist v. Martin Decker Corp., 313 So.2d 1 (La.App. 1st Cir.1975).
The proof of the relevance, importance and probative value of Dr. Hull's testimony is in the testimony itself, supra. Dr. Hull's testimony touches directly upon the point at issue, and does so with depth and precision. Moreover, Dr. Hull's area of specialization makes him more especially qualified than the other testifying doctors to analyze the medical problems here at issue: as a rhuematologist, Dr. Hull specializes in inflammations of joints and muscles. It should be noted that we consider this evidence in part, becauseeven though it was proffered at a very late stage of the litigation there is to our knowledge only a single rhuematologist in all of northeast Louisiana, and the services of this specialist were thus understandably difficult to procure.
We therefore believe that the spirit of our compensation law and jurisprudence requires us, in the interest of justice, to consider the tardy testimony of a particularly well qualified specialist which sheds clear light on the analysis of other physicians in the case who do not enjoy his special expertise. See Beard v. Coal Operators Casualty Co., 61 So.2d 255 (La.App. 2d Cir.1952).
However, Pine Hill has urged that claimant's present difficulties are a result of an arthritic condition which existed long before the accident in 1978.
Pine Hill is correct in asserting that plaintiff has had a long history of arthritis-related aches and pains. There was some testimony, although not uncontradicted, that plaintiff complained of pain before the tree fell on him in 1978. It is also unquestioned that plaintiff sought and received medical treatment for arthritic symptoms on many occasions in the decade preceding the incident in 1978. The general thrust of the medical testimony presented at trial is that claimant was afflicted, prior to his traumatic injury, with an arthritic and degenerative deterioration of the cervical and dorsal spine.
*202 The medical documentation of a pre-existing arthritic condition, however, is not inconsistent with our finding that Willie Andrews was disabled on August 21, 1978, when a tree fell on him.
Dr. Booth, who had treated claimant for many years prior to the injury, testified that while Mr. Andrews had complaints of pain in the chest or sternum area, he did not have these complaints prior to the accident. He stated that the chest pains Mr. Andrews was experiencing were not the type generally associated with arthritis.
Dr. Cline testified that claimant "has pre-existing arthritic and degenerative changes in the cervical and dorsal spine which have been temporarily aggravated by the blow [on August 21, 1978] to the neck and the upper back." Dr. Booth concurred in the prognosis and stated that the type of injury received by plaintiff was such as could aggravate a pre-existing arthritic condition. Dr. Hull testified that he associated claimant's sternum problems with the injury, and that plaintiff's disability resulted as much from the fracture of the sternum as from any problems stemming from arthritic stiffness in his neck.
Causation constitutes the crux of this case, and a careful reading of the record compels the conclusion that Mr. Andrews' present debilitated condition was triggered by the impact of the falling tree; causation, in a word, has been amply demonstrated. The graphic manner in which the falling tree reduced Mr. Andrews' working capabilitiesas well as the recognition by the medical experts that the incident contributed to his present difficultiescompels us to assert that Mr. Andrews was disabled by the falling tree. We reject defendant's contention that claimant was disabled by a pre-existing arthritic condition for the simple reason that, whatever aches and pains Willie Andrews had before being struck by a tree, they were in no wise sufficient to stop or impede his diligentindeed, relentlesslabors. How could a man proceeding at a breakneck pace be, under any meaningful sense of the word, "disabled?"
The fact that claimant has long had arthritis does not mitigate his cause of action. It is well settled that a pre-existing arthritic condition does not preclude recovery; to the contrary, there is a cause of action, under workers' compensation law, for the aggravation of a pre-existing arthritic condition. Clement v. Fidelity & Casualty Co. of New York, 220 So.2d 575 (La.App. 3d Cir.1969); Johnson v. Travelers Insurance Co., 284 So.2d 888 (La.1973); Kennedy v. Calcasieu Paper Co., 262 So.2d 800 (La.App. 3d Cir.1972); Parish v. Fidelity & Casualty Co. of New York, 124 So.2d 234 (La.App. 2d Cir.1960); Williams v. Hudson East, 261 La. 959, 261 So.2d 629 (1972).
We have placed considerable reliance on Dr. Hull and his special expertise. This is in accordance with the jurisprudential rule that courts may give due emphasis to medical specialists when their expertise, qualifications, and knowledge of the claimant's condition justify this special reliance. See Reeves v. Russo, 302 So.2d 332 (La.App. 1st Cir.1974); Allen v. Early Co., 300 So.2d 518 (La.App. 2d Cir.1974), writ refused 302 So.2d 623 (La.1974).
Thus we assess plaintiff's disability as one of a partial nature, as per LSA-R.S. 23:1221(3), in accordance with plaintiff's assertion in his first specification of error. Our review of the evidenceparticularly the testimony of Dr. Hull which we have determined to considerconvinces us that this assertion is correct.

II. PLAINTIFF'S CLAIM FOR FACIAL DISFIGUREMENT
Defendant contests, on appeal, the trial court's award of $65.00 a week to claimant for facial disfigurement. The trial record establishes that claimant suffered, as a result of his work-related injury, an L-shaped scar approximately two inches long above his left eyebrow as well as a second scar running from the top of his forehead back into his receding hairline. This facial scarring was accompanied by the severance of a nerve and many months of numbness and loss of normal sensation.
*203 LSA-R.S. 23:1221(4)(p) authorizes the payment of benefits for serious, permanent facial disfigurement. There was little question, among the medical experts, that his scarring would for the most part be permanent. The record does not indicate that the trial court's factual findings were manifestly erroneous; to the contrary, the trial transcript is firmly supportive of the trial court's findings in this respect. Accordingly, we affirm the trial court's award of $65.00 per week for 100 weeks under LSA-R.S. 23:1221(4)(p) for facial disfigurement.

III. PLAINTIFF'S CLAIM FOR STATUTORY PENALTIES AND DISABILITY BENEFITS
LSA-R.S. 22:658 mandates that insurers shall pay a 12% statutory penalty and attorney's fees for a failure to pay claims due within 60 days of demand when such a failure is arbitrary and capricious or without probable cause. This statutory mandate encompasses compensation insurers, and is thus applicable in all instances in which employers secure compensation coverage, rather than providing such coverage themselves. We find that claimant is entitled to an award of attorney's fees and statutory penalties on $730.00 in unpaid medical expenses, and in this respect reverse the holding of the trial court.
The evidence adduced at the trial level established that Willie Andrew was specifically authorized by his employer and his employer's insurer to enter Union General Hospital in September of 1979 for medical treatment. The bill for this medical treatment, for which the trial court found the defendant liable, was sent to Willie Andrews. Willie Andrews presented this bill to his employer, and on at least one other occasion presented a monthly statement from the hospital which indicated the amount was still unpaid. Mr. Andrews testified that on the occasions he presented the billor a statement thereofto his employer Mr. Allen, Allen stated that he would forward the bill to the insurer for payment. Mr. Andrews eventually stopped presenting monthly statements of the same bill because of the insurer's continual refusal to pay them. This bill in the amount of $730.00 was not paid until the time of trial and the record reveals no basis for the failure to pay this expense.
Accordingly we hold that the plaintiff is entitled to 12% penalty on this expense only, which amounts to $87.60, and we assess attorney's fees in this regard at $1,500.00. Simon v. Commercial Union Assurance Company, 389 So.2d 1367 (La.App. 3d Cir.1980).
We find that plaintiff did not adequately establish that defendant was arbitrary and capricious in discontinuing claimant's disability benefits. The record indicates that the defendants were aware that the plaintiff had returned to the woods in a supervisory capacity and was doing some work. Furthermore, they were in receipt of a release from at least one physician. Considering all of the information at their disposal, we are not able to say that the insurer was arbitrary in discontinuing disability benefits.

SUMMARY AND DECREE
In summary we have found that the claimant is permanently partially disabled in accordance with LSA-R.S. 23:1221(3) and is thereby entitled to $130.00 per week. We have also found that the trial court was not manifestly in error in holding, pursuant to LSA-R.S. 23:1221(4)(p), that claimant had suffered a specific schedule loss, was permanently disfigured and thus entitled to $65.00 a week for 100 weeks.
Likewise we have affirmed the trial court's award of $730.00 in medical expenses which was not contested here, but have found defendants arbitrary and capricious in failing to timely pay that sum, and have awarded 12% penalties thereon ($87.60), together with $1,500.00 in attorney's fees with respect thereto.
The record reveals that subsequent to his injury and having been paid $1,170.00 in weekly benefits in the amount of $130.00 per week the plaintiff returned to work on October 29, 1978. It will be recalled that *204 this injury occurred on August 21, 1978. The record shows that plaintiff received from Pine Hill Lumber Company over $196,000.00 in "wages" during 1978, and in 1979 received over $191,000.00. Plaintiff testified that he sold his logging "business" to his sons in January of 1980 for $75,000.00, on credit, which he had not received at the time of trial. Presumably he continued to earn through January, then, at approximately the same rate as during 1978 and 1979. Of course, as a partially disabled individual the plaintiff is entitled to 2/3 of the difference between what he was earning at the time of the injury and any lesser amount which he made thereafter. LSA-R.S. 23:1221(3). The difference in earnings between 1978 and 1979 was approximately $4,700.00, although it is unclear how much plaintiff earned in 1978 subsequent to the injury as contrasted to prior to the injury. Since the difference in earnings in the two years is nearly the same, presumably plaintiff's earnings were about the same before and after the injury.[1] This difference of $4,700.00 amounts to approximately $90.00 per week, 2/3 of which is less than the $65.00 benefit for disfigurement. Of course, then, the disability benefit is the higher amount during the period plaintiff was not working.
The grant of compensation benefits, where a claimant is entitled to receive benefits for both a permanent partial disability and a specific schedule loss, is governed by the Supreme Court's recent pronouncement in Jacks v. Banister Pipelines America, 418 So.2d 524 (La.1982). Under the rationale of Jacks, a compensation claimant suffering from a partial disability and a specific schedule loss may not simultaneously receive both types of benefits, although such a claimant is entitled to receive each week the remedy which is more favorable for that particular week. As we have stated, plaintiff's permanent disfigurement award of $65.00 a week is greater than the plaintiff's disability entitlement during the period he was working.
Having determined that the disfigurement award is more favorable during the weeks in which claimant was working and that the disability award is more favorable during those weeks in which claimant was not working, and that Jacks dictates that claimant be each week given the award which is most favorable for that particular week, it is now incumbent that we delineate the time periods in which plaintiff was gainfully employed.
As we have stated, the record reveals that claimant did not return to work, subsequent to the injury on August 21, 1978, until October 29th of the same year. The defendants paid disability benefits during that time. The record further indicates that claimant was workingalbeit in a supervisory capacityfrom October of 1978 through January 1980. Our review of the record does not indicate that claimant was thereafter gainfully employed.
It is ordered that upon the finality of this judgment defendants are to compensate plaintiff in a lump sum for those sums past due; i.e., (1) $65.00 per week from the time benefits ceased in October 1978 through January 1980 (representing facial disfigurement) and, (2) thereafter for $130.00 per week (representing partial disability), until current. Plaintiff is awarded legal interest on all unpaid sums. Subsequent to making the compensation current the defendants are ordered to pay plaintiff $130.00 per week as compensation for the duration of 450 weeks. This 450 week period is reduced by the nine weeks during which compensation has already been paid, and is further reduced by each week any benefits (disfigurement or disability) are paid in accordance with this judgment to make compensation current.
*205 Furthermore there is judgment for plaintiff in the amount of $730.00 in medical expenses together with legal interest thereon, and for 12% penalties thereon, and $1,500.00 attorney's fees with respect thereto.
All costs are assessed to defendants.
REVERSED IN PART AND AFFIRMED IN PART AND RENDERED.
Before PRICE, HALL, FRED W. JONES, Jr., SEXTON and NORRIS, JJ.

ON REHEARING
SEXTON, Judge.
We granted a rehearing herein to consider the defendant's contention that we were in error in rendering judgment for the plaintiff rather than remanding for additional evidence. This issue was precipitated by our consideration of the testimony of Dr. Hull which had been taken in the trial court only as a proffer on a motion for a new trial. This testimony was a significant factor in our original opinion.
While we agree that the defendant has a strong argument that the cause should have been remanded for consideration of any available testimony to rebut Dr. Hull, we have determined to reinstate our original opinion. Our reasons for so doing are that: (1) Courts of Appeal are called upon to render rather than remand where the record is as complete as possible, Boyette v. Auger Timber Co., 403 So.2d 800 (La.App. 2d Cir.1981); Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707 (La.1980); (2) Dr. Hull's expertise is of an unusual nature in that he is the only such specialist in northeast Louisiana; (3) this litigation is already unusually protracted as can be seen from our recitation of facts in the original opinion; and most importantly, (4) this is a compensation case in which there are no technical rules and in which the law calls for the courts to decide the cases on the merits "as equitably, summarily and simply as may be." LSA-R.S. 23:1317.
We have therefore narrowly determined that the cause should be rendered and we herewith reinstate our original opinion.
NOTES
[1] We are disposed of the view that the spirit of the 1975 changes in our compensation law embodied in LSA-R.S. 23:1221(3) allowing a partially disabled claimant 2/3 of the difference between what he made prior to injury and that earned after the injury assumed that any difference was precipitated by the injury. In this case the slight reduction in plaintiff's income had to do with poor weather and a "falling out" plaintiff had with his sons. However, since the disfigurement benefit is higher, and Jacks, supra, holds that a plaintiff is entitled to this benefit even when he is working, this view has no significance in this case.