660 So.2d 100 (1995)
Harry McCONNELL, Plaintiff-Appellee,
v.
CITY OF RUSTON and Office of Risk Management, Defendants-Appellants.
Nos. 27,154-CA, 27,155-CA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 1995.
*101 Smith & Shadoin by Robert E. Shadoin, Ruston, for appellants.
Teat & Avery by Darrell R. Avery, Jonesboro, for appellee.
Before MARVIN, SEXTON and STEWART, JJ.
MARVIN, Chief Judge.
The City of Ruston and its worker's compensation insurer appeal a judgment awarding weekly benefits, medical and travel expenses, penalties and attorney fees to Harry McConnell, who worked for the City's solid waste department from August 1990-February 1991, first as a "shuttle truck" driver, hauling loaded trailers to the trash dump, and then as part of a "box truck" crew, frequently getting in and out of the truck to collect empty boxes from trash bins at various commercial establishments in Ruston.
We reverse and render judgment dismissing McConnell's demands.

DISCUSSION
McConnell alleged that he has been totally disabled from working since February 1991, by either or both a neck injury he sustained at work on or about February 13, 1991, and by the effect of his work on a congenital foot condition, flat-footedness, which condition made him susceptible to developing painful lesions or calluses on the soles of his feet.
McConnell testified that he had no problems with his feet until October or November of 1990, shortly after he was assigned to the box truck crew and began spending more of his work time on his feet. He said he then began developing calluses which hurt "a little bit" at first, but "gradually" and "progressively" became more painful over the next few months, prompting him to seek treatment from a podiatrist on February 18, 1991.
McConnell attributed the calluses to his frequently having to step or jump a distance of 1½-3 feet to get in and out of the passenger compartment of the box truck, depending on whether he used the step on the side of the truck or simply jumped to the ground. He could not recall a specific incident or event that triggered the onset of the calluses.
McConnell has not worked since February 14, 1991. He filed separate w.c. claims for his neck and foot injuries, both of which the City denied. The hearing officer ruled in McConnell's favor, finding both injuries compensable, implicitly classifying McConnell's condition as temporary total disability.
The City argues the hearing officer was clearly wrong in finding the neck injury compensable, claiming the medical evidence does not corroborate McConnell's account of the injury itself, nor show that the injury, if any, prevented him from working.
With respect to the foot condition, which McConnell said developed gradually, and which was not alleged or shown to have resulted from an identifiable incident or event that may be construed as an "accident" under the w.c. law, the City contends compensation is legally barred, citing the statutory definition of the term "accident," LRS 23:1021(1), as amended by Acts 1989, No. 454, and this court's interpretation of the amended definition in Rice v. AT & T, 614 So.2d 358 (La.App.2d Cir.1993). See discussion infra.
We review the record factually in the light that most favorably supports the judgment. Theriot v. Allstate Ins. Co., 625 So.2d 1337 *102 (La.1993); Harrison v. Myers, 25,902 (La. App.2d Cir. 6/22/94), 639 So.2d 402.
The hearing officer's conclusion that McConnell injured his neck at work cannot be said to be clearly wrong under the standard of Rosell v. ESCO, 549 So.2d 840 (La. 1989), inasmuch as there were two permissible views of the evidence on this purely factual issue.
While the existence and extent of a claimant's disability from a work-related injury is essentially a factual issue to be determined from the totality of the evidence, both lay and medical, the disability must conform to the statutory definitions of LRS 23:1221. Bailey v. Smelser Oil & Gas, Inc., 620 So.2d 277 (La.1993); Jackson v. Georgia Cas. and Sur. Co., 513 So.2d 530 (La.App.2d Cir.1987), writ denied.
The evidence in this record, even when viewed most favorably in support of the judgment, does not reasonably allow the conclusion that McConnell was totally, or even partially, disabled from working by his neck injury within the statutory definition.
The foot calluses, which were deemed partially but not totally disabling by McConnell's podiatrist, were not shown to have resulted from a work-related accident, as that term has been legislatively defined. See authorities cited supra and discussed infra.
On this record, we must conclude that McConnell is not entitled to benefits for either of his injuries.

APPLICABLE LAW
For each of the injuries, neck and foot, that formed the basis of his respective claims for weekly benefits, McConnell was required to prove that he sustained a work-related injury by accident, as that term is statutorily defined, and that the injury caused some type of disability that prevented him from working during the period for which benefits are claimed. LRS 23:1031, 1221; Burnes v. Wizard Enterprises, Inc., 543 So.2d 616 (La.App.2d Cir.1989); Wokoma v. Hawk Pipe Service, Inc., 509 So.2d 665 (La.App.3d Cir.1987). The claimant need not prove the exact cause of the disability, but must prove a causal relationship between the work accident and the disability. Quinones v. U.S. Fidelity and Guar. Co., 93-1648 (La. 1/14/94), 630 So.2d 1303; Lubom v. L.J. Earnest, Inc., 579 So.2d 1174 (La.App.2d Cir. 1991).
DEFINITION OF "ACCIDENT"
The term accident is legislatively defined:
"Accident" means an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.
LRS 23:1021(1), as amended by Acts 1989, No. 454, effective Jan. 1, 1990. Our emphasis.
The emphasized language did not appear in the pre-1990 definition, leading this court to conclude, in Rice v. AT & T, cited supra, that the amendment reflected the legislature's deliberate intention "to ... reduce the circumstances which amounted to an accident under [the pre-1990] law." Fn. 3, 614 So.2d at 361. Our brackets.
McCoy v. Kroger Co., 431 So.2d 824 (La.App.2d Cir.1983), illustrates the broader, pre-1990 interpretation of the term, which allowed the claimant to recover benefits under facts similar to those presented here. By virtue of the 1990 amendment in effect when McConnell began experiencing problems with his feet, McCoy does not control this appeal.
[T]he term accident now includes a weakened condition which collapses due to a precipitous event, but does not include a weakened condition which gradually degenerates over time.... [T]he key requirement under the amended definition... is that the event directly produced sudden objective findings of an injury rather than being merely a manifestation of a gradual deterioration or progressive degeneration.

Rice, supra, 614 So.2d at 361.
The "actual, identifiable, precipitous event" under the present law may include a routine movement or task that the claimant regularly *103 performs, if the claimant is able to identify with some particularity as to time, place and manner, the objective manifestation of the accidental injury. See, for example, these cases in which a compensable work accident resulting from the performance of routine tasks has been found, based on evidence of a sudden identifiable event: Rice, supra (telephone assembly line worker with pre-existing back problems felt back pain and leg numbness as she tried to push her chair closer to the line while twisting and turning to reach the telephone parts); Doucet v. Baker Hughes Production Tools, 93-3087 (La. 3/11/94), 635 So.2d 166 (worker with congenital back instability "felt his back snap" while moving equipment at work); and Haley v. Beall-Ladymon6 Corp., 25,619 (La.App. 2d Cir. 3/30/94), 634 So.2d 917, writ denied (movement of retail merchandiser up or down ladder as she reached toward display, which produced immediate "sharp, shooting pain" and swelling in her foot, caused or aggravated abnormality of her lymphatic system, resulting in chronic foot swelling).

FOOT INJURY
McConnell gave this testimony about his foot calluses:
Q. When did your foot problem start; do you know?
A. It started my feet started bothering me between October and November a little bit, just slightly. But it progressively got worse.
Q. Now, where were you when you hurt your feet?
A. I don't know. Like I say, it start[ed] gradually hurting.
Q. Can you give me an idea of what caused it to hurt?
A. I think jumping in and out of that truck in cold weather, 20 degrees, your feet wet, jumping in and out of that truck. That's what I think it started from.
Q. But this started you think in October or November while you were on the job?
A. Yeah. Gradually starting to build up, yes. (Our emphasis.)
According to the office notes of McConnell's podiatrist, Dr. Reeves, McConnell's chief complaint on his initial visit, February 18, 1991, was "painful feet making work hard to accomplish." McConnell gave Dr. Reeves a description of his normal job duties for the City, and said his feet had been bothering him for about four months, but did not mention a particular incident or event that he associated with the onset of the calluses, other than "walking on and off the truck." McConnell was then 49 years old and had held other jobs that require frequent standing, such as finishing concrete and managing restaurants, for many years before he began working for the City.
In his deposition, Dr. Reeves explained the correlation between McConnell's flat-footedness and the painful calluses, or keratosis:
[W]hat I mean by flat feet, he has no arch. When his foot strikes the ground, it strikes it in a totally flat plane which is not ... normal and is considered a deformity in the sense that it tends to promote these... calluses that he came in complaining and showing me were hurting him. And this type of foot problem [flat-footedness]... [is] something that he ... had at birth, and it's not something that is ... caused by a job.
[H]e stated to me in his medical history that this had only bothered him for four months prior to my seeing him, and the type of foot that he has has been there since birth.... [H]e may have been ... undergoing a change where ... his foot type with the flat feet couldn't tolerate this kind of work anymore, and the end result is that these [calluses] start to arise.
And if I could use an analogy, it would be like a ballplayer who's a pitcher going out and pitching a baseball game and he's been doing it for quite a while, but he's getting on up [in] age [and] the amount of stress that he's putting on himself begins to work on his ... muscles, bone structure, skin structure. As he gets older, his body can't tolerate [as] much stress as it once did, maybe, say, when he was [20] years old, and ... if he continues to do the kind of regimen that he's required to do in either ... pitching or, in this case, walking or jumping on and off a truck, the end *104 result is that the foot starts to break down and develop these ... [calluses]. (Our emphasis and brackets.)
In a letter report that McConnell delivered to his supervisor shortly after his visit to Dr. Reeves, the doctor opined that McConnell's "normal work/walking on and off truck... has made a normally asymptomatic foot deformity [flat-footedness] crippling ... Return patient to previous job description, eliminating walking on and off vehicle." (Our emphasis.) The City had no job openings within these restrictions. McConnell elected not to return to his former duties, effectively terminating his employment with the City on February 20, 1991.
The hearing officer found that McConnell "accelerated his pre-existing foot condition while employed ... [by] the City of Ruston. This condition occurred as the result of his jumping in and out of the garbage truck daily, as well as in and out of the [trash] bins in search of the boxes to be thrown out."
Although McConnell's foot calluses were at least partially disabling, according to Dr. Reeves, the evidence in this record, both lay and medical, does not allow, but rather precludes, a finding that the disabling condition was caused by a work-related accident, or "an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, ... and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration." § 1021(1).
McConnell has not alleged that his foot condition is compensable as an occupational disease under § 1031.1. The statutory basis for his claim is § 1031, which requires proof of a work-related "injury by accident," even in circumstances where the claimant's work can be said to have accelerated a pre-existing condition, as the hearing officer found here. See Rice, Doucet and Haley, all cited supra.
The evidence in this record, even when viewed most favorably to McConnell, does not prove the requisite element of accidental injury under § 1031, as that term has been legislatively defined in § 1021(1). Absent such proof, McConnell is not entitled to recover weekly benefits (§ 1221) or medical and travel expenses (§ 1203) for his foot injury.

NECK INJURY
The hearing officer found that McConnell injured his neck on or about Wednesday, February 13, 1991, by striking the back of his neck on a steel arm protruding from the top of a trash bin as he rose from a stooping position while collecting discarded boxes from the ground. This finding, which was based on the testimony of McConnell and a co-worker, cannot be deemed to be clearly wrong on this record, and satisfies McConnell's burden of proving a work-related accident with respect to his neck injury.
Proof of a work accident, however, is not enough to establish a claim for benefits. The claimant must also prove that the work accident caused some type of disability defined in the w.c. statutes. See Burnes, Wokoma, Quinones and Lubom, all cited supra.
McConnell claimed, and the hearing officer apparently found, that he was temporarily totally disabled by either or both his neck injury and his foot calluses. Having found that the foot injury is not compensable, we must determine whether the evidence with respect to McConnell's neck injury satisfies his statutory burden of proving
by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.
§ 1221(1)(c). Our emphasis.
McConnell and his co-worker testified that McConnell struck his neck on the trash bin near the end of their shift on February 13, but could not recall or approximate the time of the incident. McConnell finished his shift that day, and worked a full day the next day, with no neck pain. He took the next day, Friday, off from work, not because of any *105 neck pain, but because his feet were bothering him. The following Monday, February 18, McConnell had a friend drive him from his home in Chatham to see the podiatrist, Dr. Reeves in West Monroe, for his foot problems.
McConnell testified that over the weekend of February 16-17, he began having chest pains which he feared were heart-related. On Tuesday, February 19, McConnell saw his family doctor in Jonesboro, Dr. Roncal, complaining of pain on the left side of his chest, left shoulder pain, and a cough. McConnell did not complain to Dr. Roncal of neck pain or give a history of having injured his neck at work.
McConnell testified that he first became aware his neck had been injured in the February 13 work accident during Dr. Roncal's physical examination of him on February 19. According to McConnell, when Dr. Roncal touched a tender area in his left arm or shoulder, McConnell "hollered in pain" and told Dr. Roncal he "felt pain shoot all the way down [his] body." McConnell said Dr. Roncal then told him that he had "a pinched nerve in his neck," for which the doctor prescribed a muscle relaxer.
McConnell's account of the February 19 visit is not corroborated by Dr. Roncal's office notes. While these notes mention that Dr. Roncal found some tenderness on the left side of McConnell's neck and in his left shoulder, they say nothing about a pinched nerve in the neck or a prescription for a muscle relaxer. Dr. Roncal's sole diagnosis was bronchitis, for which he said he prescribed a cough medicine and advised McConnell to stop smoking cigarettes. When his deposition was taken in January 1994, Dr. Roncal had no record or recollection of having diagnosed or prescribed medication for a neck injury on McConnell's February 19 visit.
McConnell did not work on February 18 or 19, taking sick leave to see Drs. Reeves and Roncal, respectively. He obtained from Dr. Roncal a written excuse that states: "Harry McConnell has been under medical care from 2/18 to 2/19. He will be able to go back to work on 2/20/9[1]." Our emphasis. McConnell delivered this excuse, which says nothing about why he was under Dr. Roncal's care, to his supervisor on February 20, along with Dr. Reeves' recommendation that his job duties be changed to eliminate walking on and off trucks because of his foot condition.
McConnell testified that he also gave his supervisor a note from Dr. Roncal stating he had a pinched nerve in his neck. Neither Dr. Roncal's records nor the City's contain any such writing.
On conflicting testimony (McConnell vs. his supervisor), the hearing officer found that McConnell reported his neck injury to his supervisor on February 20, about two weeks before he filed a formal report of injury on March 5. Even McConnell, however, did not testify that he reported or claimed that the neck injury prevented him from working when he told his supervisor he had injured his neck on the job.
McConnell returned to see Dr. Roncal six months later, on August 19, 1991. On that visit, according Dr. Roncal's office notes, McConnell complained of neck pain and was referred to an orthopedic surgeon, Dr. Greer, for specialized care. Dr. Roncal explained in his deposition that McConnell may have said his pain had persisted since he injured his neck in February, and may have also complained of pain and numbness in his arm, even though the office notes do not reflect this. In any event, Dr. Roncal testified that the treatment of patients with neck pain, particularly when it is chronic or radiates into other parts of the body, is "beyond ... the realm of ... family practice."
Dr. Roncal's office scheduled for McConnell an appointment with Dr. Greer, and ordered neck X-rays for Dr. Greer's evaluation. McConnell had the X-rays made at a local hospital but did not keep or reschedule his appointment with Dr. Greer, explaining that the City refused to pay for the visit and he could not afford to pay for it himself.
At trial in January 1994, McConnell testified that he had had neck pain and muscle spasms in his chest and shoulder since February 1991. He also said he began having severe headaches and back pain at some unspecified time after his last visit to Dr. Roncal in August 1991.
*106 McConnell testified that these problems, as well as the painful calluses on his feet that did not subside even after he stopped working in February 1991, prevented him from doing any type of work. His only attempt to work was in 1992, when he did about five hours of inventory work at a retail store in Monroe over a two-day period. McConnell said he "couldn't handle that job," because of his headaches and his foot pain.
After hearing McConnell's testimony, and in light of the fact that McConnell's neck-related complaints had not yet been evaluated by a specialist, the hearing officer ordered the City to pay for a neck and back evaluation by a specialist, and deferred her ruling until she received a report of his findings.
McConnell was examined by a Shreveport neurosurgeon, Dr. Martinez, on March 21, 1994. McConnell told Dr. Martinez he "had a work injury [i]n February 1991." He complained of "persistent ... cervical and subsequently lumbosacral pain, intermittent headaches..., with some muscle spasms on ... the chest wall, [pain] which sometimes radiates... to the left hip and leg [, and] intermittent tingling ... [in] the left leg and thigh."
Notwithstanding these complaints, McConnell's neurological examination was essentially normal, causing Dr. Martinez to conclude that McConnell has "chronic cervical and lumbosacral pain without any positive findings... [f]rom the neurosurgical ... point of view[.]" After reviewing X-rays of McConnell's neck and back that were taken in February 1994, some three years after the work accident, Dr. Martinez wrote to McConnell on March 23, 1994:
[The X-rays show] no evidence of any fracture or ... other abnormality. I believe that this is a muscle ligament injury of the [neck] as well as the lower back.
I think that you will just require some time to get over this and you do not require any surgical intervention. I advise you to return to see Dr. Roncal.
By judgment of May 11, 1994, McConnell was awarded weekly "worker's compensation benefits ... from the date of his accident, February 21, 1991 [sic] until he is fully released to return to work by Dr. S.G. Roncal."
According to the evidence in this record, McConnell has never been restricted from working, totally or partially, as a result of his neck injury, either by his treating physician, Dr. Roncal, or by the consulting neurosurgeon, Dr. Martinez. The medical records of McConnell's visit to Dr. Roncal on February 19, 1991, which took place about a week after McConnell's neck-related work accident, even when construed liberally and in layman's terms, simply do not bear out McConnell's contention that Dr. Roncal diagnosed and prescribed medication for "a pinched nerve" in McConnell's neck on that visit. McConnell's account of the February 19 visit is further weakened by Dr. Roncal's testimony that he generally does not treat patients with neck pain, particularly those with symptoms suggestive of nerve compression, but instead refers them to a specialist, as he did when McConnell complained to him of neck and arm pain in August 1991.
LRS 23:1317 generally provides that the factfinder in a w.c. case
shall not be bound by technical rules of evidence or procedure other than as herein provided, but all findings of fact must be based upon competent evidence and all compensation payments provided for in this Chapter shall mean and be defined to be for only such injuries as are proven by competent evidence, or for which there are or have been objective conditions or symptoms proven, not within the physical or mental control of the injured employee himself.
This provision has been construed to mean that a w.c. disability claim must be supported by "objective and medically verifiable" physical symptoms, and that the existence of a disabling work injury must be medically corroborated, even in circumstances where the medical evidence differs as to the extent, cause or duration of the injury. Andrews v. Pine Hill Wood Co., 426 So.2d 196, 200 (La. App. 2d Cir.1982), writ denied.
Even allowing for the resolution of all credibility calls in McConnell's favor, the evidence in this record lacks the requisite medical corroboration that McConnell's neck injury *107 from the February 1991 work accident was disabling, either totally or partially. See TTD and SEB disability definitions and corresponding burdens of proof under § 1221, partially quoted supra. See also and compare Shelton v. Wall, 614 So.2d 828 (La.App. 2d Cir.1993), and Wokoma v. Hawk Pipe Service, Inc., cited supra.
A claimant who incurs medical and travel expenses for the treatment of a work-related injury is generally entitled to recover those expenses from his employer, even if the injury is not disabling. § 1203. On this record, however, we must conclude that no award of medical or travel expenses is warranted for McConnell's neck injury, inasmuch as Dr. Roncal's February 19, 1991, office notes and excuse for missing work make no mention of a neck injury, and the subsequent neck treatment, which began in August 1991, has not been preponderately shown to have been causally related to the work accident that occurred six or more months earlier.
In the face of our findings that the City is not obligated for weekly benefits, medical or travel expenses for either of McConnell's injuries, foot or neck, the hearing officer's assessment of penalties and attorney fees against the City must also fall.
While McConnell proved a work-related aggravation of his congenital foot condition, he has failed to prove the foot problems resulted from an accident within the meaning of § 1021(1). While McConnell proved he accidentally injured his neck at work, he has failed to prove by clear and convincing evidence that his neck injury makes him physically unable to engage in any employment or self-employment within the meaning of § 1221(1)(c), or to prove by a preponderance of the evidence that the neck injury has impaired his earning capacity to the extent necessary to recover supplemental earnings benefits under § 1221(3).

DECREE
Reversing the judgment awarding McConnell weekly benefits, medical and travel expenses, penalties and attorney fees, we render judgment for the City, dismissing McConnell's demands with prejudice, and at his cost.
REVERSED AND RENDERED.